1

<pre>
 1                IN THE UNITED STATES DISTRICT

 2            FOR THE WESTERN DISTRICT OF TENNESSEE

 3                      WESTERN DIVISION

 4   ===================================================

 5   UNITED STATES OF AMERICA,

 6                     Plaintiff,

 7   vs.                              No. 2:17-cr-20129-SHL

 8   DANE SCHRANK,

 9                     Defendant.

10   _____


11

12

13                  RE-SENTENCING HEARING

14

15       BEFORE THE HONORABLE SHERYL H. LIPMAN, JUDGE

16

17                         Wednesday

18                    7th of August, 2019

19

20

21

22

23            CANDACE S. COVEY, RDR, CRR
                   OFFICIAL REPORTER
24           FOURTH FLOOR FEDERAL BUILDING
               MEMPHIS, TENNESSEE 38103
25


                   UNREDACTED TRANSCRIPT
</pre>

1                A P P E A R A N C E S

2

3

4

5    Appearing on behalf of the Plaintiff:

6              MS. DEBRA IRELAND
               U.S. Attorney's Office
7              167 N. Main Street
               Suite 800
8              Memphis, TN 38103
               (901) 544-4231
9

10
     Appearing on behalf of the Defendant:
11
               MR. MARK MESLER
12             Rosenblum & Reisman
               80 Monroe Avenue
13             Suite 950
               Memphis, TN 38103
14             (901) 527-9600

15

16

17

18

19

20

21

22

23

24

25

                    UNREDACTED TRANSCRIPT

1                              Wednesday

2                              August 7, 2019

3            The Re-Sentencing hearing in this case began on this

4    date, Wednesday, 7th day of August, 2019 at 1:30 p.m., when

5    and where evidence was introduced and proceedings were had as

6    follows:

7

8                     ----------------------

9

10           MR. MESLER:  Good afternoon, Judge.

11           THE COURT:  Come on up for Mr. Schrank's

12   sentencing -- re-sentencing.  Good afternoon, everyone.

13           MS. IRELAND:  Afternoon, Your Honor.

14           MR. MESLER:  Good afternoon.

15           THE COURT:  So we are here because the Sixth

16   Circuit told us we had to come back here for Mr. Schrank's

17   re-sentencing.  I've got -- in addition to the documents I

18   had before, which include the presentence report, the one

19   addendum, the Government's position paper at the time and the

20   Defendant's position paper at the time, I also have -- the

21   Defendant has filed a new position paper, new with sort of

22   quotation marks around it, I guess.  Some of the same stuff,

23   but the letters are all -- I think all updated and all have

24   2019 dates on them.  And the Defendant is --

25   Mr. Mesler's position paper is sort of updated.

 1                Ms. Ireland, I didn't receive anything from you.

 2    Do you have an updated position?

 3                MS. IRELAND:  I do not have an updated position,

 4    Your Honor.

 5                THE COURT:  All right.  Any other documents I

 6    should have?

 7                MR. MESLER:  Nothing I can think of, Your Honor.

 8                MS. IRELAND:  I don't believe so.

 9                MR. MESLER:  Oh, I take that back.  One of the

10    things I told Ms. Ireland I would be referring to, and I

11    didn't know if the Court wanted a copy of it, a Tennessee --

12    not Tennessee.  I get so used to that.  A United States

13    Supreme Court opinion from 2011 indicating that

14    post-sentencing behavior on a re-sentencing can be

15    considered.  That's from the United States Supreme Court

16    Pepper versus United States.  And I have a copy of that if

17    the Court wants to see it.

18                THE COURT:  Okay.  Does the Government have any

19    different opinion of that?

20                MS. IRELAND:  No, Your Honor.  We absolutely

21    concur that what's happened in the interim -- the interim two

22    years is certainly entitled to be considered, and the Court

23    should do so.

24                THE COURT:  Okay.  We're in a position that I

25    have not been in before to resentence someone on a -- on a

1   reversal of a sentence.  So my view of this is -- you know,

2   there weren't objections to the guidelines.  It's not a

3   guideline conversation.  All of that is on the record.  I

4   don't feel the need to go back through it, unless you all

5   tell me I need to.  I think -- I think the issue that the

6   Sixth Circuit thought was not adequately addressed had to do

7   with the 3553 factors, and the two they highlighted were --

8   they said I ignored or minimized the severity of the offense

9   and failed to account for general deterrence.

10          I'm going to start by saying I disagree with the

11   Sixth Circuit.  I think that this was an opinion that despite

12   the context in which they are supposed to address sentencings

13   that only if they're substantively unreasonable are they

14   supposed to second-guess a district court judge's decision on

15   sentencing, I think that they -- that's exactly what they

16   did, is they second-guessed my decision on what the sentence

17   should be based on their own evaluation of the factors.

18          And I say that because first, you know, I went

19   back and reviewed the transcript from the sentencing, and I

20   did not ignore or minimize the severity of the offense.  And

21   frankly, Mr. Schrank didn't either in reading his statement

22   about how he felt about what he had done.  I talked about the

23   severity of it and how horrific it was.  He did too.

24   Mr. Mesler did.  And obviously Ms. Ireland did too.  So

25   frankly, I think the Sixth Circuit was completely off base on

1    their comment there.

2              They pulled out language that I -- I didn't quote

3    exactly what he had done.  I didn't say he had downloaded an

4    anonymizer.  I think I got that right.  We'll spell it later.

5    But I think that the -- to me the issue with that is -- has

6    to do with, a little bit, the sophistication of the judges on

7    the Sixth Circuit when it comes to computers versus the

8    sophistication, frankly, of a 21 year old when it comes to

9    computers and the ignoring of the fact that, frankly, the

10   Sixth Circuit may not completely understand what all of that

11   means in terms of use of a computer.  The use of a computer

12   today is done with much more ease and much more -- much less

13   exaggerated conduct than I think the Sixth Circuit judges

14   realize.

15             I point, you know, just to one thing,

16   Mr. Schrank's studying computers, and he understands them a

17   whole lot more than -- and I'll include me in this

18   category -- than I do.  And what that, I think, translates

19   into is -- without a doubt, the conduct was horrendous.  I'm

20   not making light of it.  But the ease with which one who

21   understands computers moves through a computer, and just the

22   fact that that doesn't -- the ease of moving through a

23   computer doesn't make the conduct more extreme.  And I'm

24   talking about just the computer programming itself, nothing

25   to do with the images, but just the way in which someone can

1    move through a computer who understands them, doesn't add to

2    the extremeness of the behavior.  I'm not sure if I'm making

3    that clear, but I do -- I think there's a disconnect between

4    generations and the way in which people understand computers

5    today versus some of us who are older.

6                However, the rest of what they cited -- and

7    honestly, Mr. Schrank's behavior here was horrific.  No one

8    has disputed that, including, as I said earlier, Mr. Schrank.

9                All right.  They also said I failed to account

10   for general deterrence.  And I read -- reread the transcript,

11   and I will say that I never mentioned the words "general

12   deterrence" in the transcript.  I talk a lot about specific

13   deterrence.  I talked a lot about all of the other factors.

14   I did not mention general deterrence.  And so let's talk

15   about general deterrence and what that may mean, particularly

16   in the context of a sentencing that, as I say at the

17   beginning of every sentencing I do, has to be individualized

18   to the person in front of me.  I'm not sentencing the entire

19   community.  I'm sentencing Mr. Schrank.  I understand that

20   some argue that has an impact on the rest of the community,

21   and sometimes I agree with that, sometimes I don't, but at

22   the end of the day, I'm still sentencing Mr. Schrank.

23                Am I saying that right again?

24                THE DEFENDANT:  Yes, ma'am.

25                THE COURT:  Okay.  All right.  Let me hear from

1   everyone on your position.  Ms. Ireland.

2          MS. IRELAND:  Your Honor, you are crafting an

3   individualized sentence for Mr. Schrank.  But that is not the

4   only purpose of sentencing.  It is a very important part of

5   the objective to sentencing.  However, just punishment,

6   promoting respect for the law, general deterrence and

7   unwarranted sentencing disparities are also things that need

8   to be considered.  A week after Mr. Schrank was in court,

9   another man approximately the same age as him, charged with

10  the same offense, also working with a lower criminal history

11  score, got a sentence of 50 months.

12          THE COURT:  By me or another judge?

13          MS. IRELAND:  Before you, Your Honor.  It was a

14  week's difference.  He was a young man who was employed, on a

15  professional track, had a college education and was doing the

16  same thing, participating in somewhat off the grid and

17  somewhat sophisticated computer exchanges of children

18  involved in sexually explicit situations.

19          THE COURT:  Doesn't that tell you that I consider

20  the individual factors and the person in front of me and all

21  the different factors and really made a good decision?

22          MS. IRELAND:  I think it tells me, Your Honor,

23  that you are very focused on the individual.  And that's

24  admirable.  And it's an important part of sentencing.  From

25  the point of the US Attorney's Office and the Department of

1    Justice, there are some of us who really dislike sentencing

2    days because we also try to focus on the individual, and we

3    understand that they're very difficult calls to make.

4           However, when it comes down to a crime like

5    exchanging child pornography and technology that is almost

6    designed to help you hide from law enforcement, when you

7    utilize that technology, you're acknowledging that you know

8    your behavior is wrong, and you're still going to engage in

9    it.  You choose to engage in it.  This was some -- some very,

10   very violent material.  Forty-nine children during this

11   investigation were rescued from active abuse situations with

12   their images being shared.  That's really important, because

13   it feeds a market.

14          And the general public may not know the

15   sentences, but be assured that those who do try to avoid law

16   enforcement and engage in conduct like this share the word

17   amongst themselves.  That's a very important deterrent

18   concept.  A person who lives down the street from us, they

19   may care, they may not care.  But those who are engaged,

20   involved and intent on receiving these images may think twice

21   because they share this information.  And that's why it

22   matters, Your Honor.  General deterrence needs to be a factor

23   in whatever sentence is imposed.

24          The United States is still recommending a bottom

25   end of the guideline sentence.  And the United States is well

1  aware and encourages the Court to note that Mr. Schrank has

2  been a model citizen in the ensuing two years.  It is not his

3  fault that this process takes time.  However, we do think

4  that the general deterrence argument is important, and we do

5  think that it is simply not met by noncustodial sentences.

6           THE COURT:  So, Ms. Ireland, what that tells me

7  is you -- because your position is the same, you have not

8  taken into account anything Mr. Schrank has done in the last

9  two years.

10          MS. IRELAND:  No, Your Honor, I don't agree with

11 that statement.  One of the things we did do is take into

12 account what Mr. Schrank did between the time his behavior

13 was discovered and the time we chose to charge him with just

14 a single count of possession.  We account for who he is and

15 what he has done to make amends or recognize or show remorse

16 sometimes in our charging decisions.

17          THE COURT:  No, but you can't -- if you -- if you

18 are still at the same place, by definition you can't have

19 taken anything into account in the -- in the two years since

20 I sentenced him.

21          MS. IRELAND:  When someone is aware that an

22 appeal is pending, much like when they have pled to an

23 offense and are aware that sentencing is coming, they will

24 often behave better than they would otherwise because they

25 are aware that there is more yet to be resolved.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.

2          MS. IRELAND:  And so I weigh that a little less

3     heavily than Your Honor may.

4          THE COURT:  Well, that's more of a direct answer

5     to the question, that you think he -- in the last two years,

6     the fact that he's been doing everything he's supposed to be

7     doing, plus more, you don't think that should be weighed

8     because your position -- for someone who has successfully

9     completed everything he has completed, continues to do well,

10    is about to get, you know, some sort of degree from

11    Vanderbilt, you know, you have to not be taking any of that

12    into consideration if you're still in the same place you were

13    before.  It just doesn't make sense that you would -- and

14    that's fine.

15         MS.  IRELAND:  I understand the Court's

16    reasoning.

17         THE COURT:  If that's your position, that's fine.

18    I'm just trying to kind of drill down.

19         MS.  IRELAND:  No, I understand what you're

20    getting at, Your Honor.  And again, the Court may take that

21    into consideration.  We acknowledge it.  And that's a very

22    good thing.  But insofar as determining what is an

23    appropriate sentence, what we don't consider is ensuing time

24    when something is pending.  Or maybe some would.  I don't

25    know.  But in this case, the guidelines reflect the behavior,

1 and a low end guideline sentence is appropriate.  And that is

2 our recommendation.

3         THE COURT:  When you said the time when --

4 between the time he was caught and the time that you all

5 ended up on a one count, what are you --

6         MS. IRELAND:  Information.

7         THE COURT:  Information, yeah.  What are you --

8 you're talking about there that he cooperated, so that's why

9 you're recommending low end?

10         MS. IRELAND:  Not so much --

11         THE COURT:  I mean --

12         MS. IRELAND:  Yes.  Not so much --

13         THE COURT:  -- accepted responsibility.

14         MS. IRELAND:  Exactly.  Not so much cooperated,

15 but acknowledged right away, did not return to the behavior,

16 did not get arrested subsequently, did not alert others so

17 far as we know.  Those are all things that we consider in

18 charging decisions too.  And it is admirable.  But on the

19 other hand, the conduct is egregious, and when people are up

20 against the wall, they will often make better decisions for

21 themselves.  So we do take it and weigh it, but it is not the

22 deciding factor in the recommendation.

23         THE COURT:  All right.  Mr. Mesler.

24         MR. MESLER:  Your Honor, if the question is about

25 general deterrence and what the defense's position is about,

1    I have to admit, it's very unusual to be asked that because

2    I'm not often, given the nature of what I do for a living,

3    asked how I think the sentence could generally deter people.

4    What I would ask the Court to look at from the perspective I

5    come from is this:

6              If general deterrence is one of the goals, which

7    again obviously it is, then people get sentenced -- I had a

8    person sentenced a month and a half, two months after

9    Mr. Schrank who got some seven years, maybe even seven-plus

10   years, in another courtroom in the Western District.  People

11   who are -- are being deterred by all of these sentences, and

12   they vary, but they are all lengthy incarcerations in my

13   mind.  Anything north of four years would be, without

14   question, lengthy incarceration.

15             So the one outlier like Mr. Schrank, who doesn't

16   get that sentence, I don't think that's thwarting general

17   deterrence.  I don't think that goes in the face of general

18   deterrence.  I think the people out there who are seeing and

19   hearing about these sentences must think, oh, well, I

20   don't -- he must have cooperated with the Government.  They

21   don't know that his mother died in his arms when he was a

22   teenager.  They don't know all of the things, you know,

23   that -- and one of the things that Ms. Ireland didn't

24   mention, but I know was a factor in her consideration, at

25   least I think it was, was that, you know, we could have

1    litigated some of the issues in this case because it was a

2    government-run website that he was using.

3              And we didn't file a motion to suppress.  We

4    didn't have -- there was litigation all over the country

5    about it at the time.  He did not do that.  I asked

6    Mr. Schrank.  I told him that was on option.  And he said,

7    no, I want to accept responsibility and take what's coming to

8    me.  He has met this head on in every way.

9              So I think when you talk about general

10   deterrence, I don't think Mr. Schrank and his case being the

11   outlier between everybody who gets five to ten years or

12   whatever they're getting in the way of incarceration is going

13   to change general deterrence.  It's not going to have an

14   impact on general deterrence.  And when we talk about

15   Mr. Schrank, it has to be specific deterrence.  And I don't

16   think I need to remind the Court, or Ms. Ireland, of all the

17   ways that that's not necessary because whatever we're doing

18   is working.

19             Again, at the end, I would close with all the

20   stuff that I have found that he's done in the last two years,

21   but the Court knows that I am, based on my position paper,

22   just overly -- I do not think you could have written the

23   script better for how somebody would handle the sentence Your

24   Honor imposed than how he's done since August of 2017.

25             MS. IRELAND:  If I could just clarify one thing,

UNREDACTED TRANSCRIPT

1   Your Honor?

2              THE COURT:  Yes.

3              MS. IRELAND:  The United States did not run the

4   website.  The United States used it for less than two weeks

5   in order to catch people who were using the website.

6              MR. MESLER:  My apologies.  I didn't mean to

7   mischaracterize it.

8              THE COURT:  Mr. Schrank, anything you would like

9   to say?

10             THE DEFENDANT:  I can't really speak for general

11  deterrence.  I mean, I know for one that I never -- I mean,

12  whether I'm speeding or whether I did this, whether I was

13  doing drugs, I never looked up how much jail time is

14  possible.  I've never -- I mean, people that commit murders

15  in which, you know, anything, I don't think that people look

16  up sentencing.  And after my initial court date, and I was

17  told by Mr. Mesler that I have a chance of coming back, I

18  told my parole officer, and I told my therapist, and both of

19  them having dealt with people like me a lot, I assumed they

20  pretty much knew what they were talking about.  They said,

21  "Don't worry about it.  Nothing's going to come of it."  They

22  said something like double jeopardy being illegal or

23  something like that.  I don't really know.  I just kind of

24  rolled with it.  So I didn't -- I didn't do any of this stuff

25  for myself expecting to come back here and have to be like,

1    hey, Your Honor, I've changed.  I've done it for myself.  I

2    haven't done it for anyone else.

3              THE COURT:  Okay.  Thank you, Mr. Schrank.  Now

4    you know not to take legal advice from a parole officer or a

5    therapist.

6              Anything from anyone else?

7              MS. IRELAND:  Nothing to add, Your Honor.

8              MR. MESLER:  Nothing on general deterrence, Your

9    Honor.

10             THE COURT:  Anything from probation?

11             PROBATION OFFICER:  No, Your Honor.

12             THE COURT:  So my job is, again, to consider the

13   advisory sentencing guidelines, as well as the 3553 factors

14   to make an individual assessment about Mr. Schrank's

15   sentence, to impose a sentence that's sufficient, but not --

16   let's emphasize these words -- sufficient, but not greater

17   than necessary, to comply with the purposes of sentencing.

18             Again, looking at all the 3553 factors.  First,

19   the nature and circumstances of the offense and the

20   seriousness of it.  As I've -- as I said before -- and I'm

21   quoting from the transcript -- it's an extraordinarily

22   serious offense because by there being viewers out there

23   looking at these images, that creates a market forum, and it

24   means that children are abused and raped in order for those

25   images to be created.  And anything that adds to the

1   exploitation of children is -- I said "you know" -- among the

2   most serious things that can happen in our society.  That's

3   the end of the quote from the transcript.

4         I absolutely still believe what I said, and I

5   have to recognize that the defendant also recognized the

6   seriousness.  He said to me at sentencing -- I was looking at

7   my notes, actually.  I guess I can look at his -- his very

8   words.  And this is a quote from the transcript, that it's

9   absolutely undescribable of the things that they're going

10  through and the things that they'll continue to go through

11  because it's on the Internet.  He said, "The Internet is an

12  unwipeable place.  It's always going to be somewhere.  And

13  it's just it's -- it's an unbelievable burden for me that

14  I've actually put someone through that.  It's terribly

15  personal, and it's just not something that I'd like to

16  continue to think about it, but I can't help it.  And then

17  neither can they.  They're going to continue to think about

18  it as well."

19        We all recognize the -- that's the end of the

20  quote.  We all recognized at the previous sentencing hearing

21  and again recognize today how horrific it is that these --

22  these kids were abused, violence perpetrated upon them.  In

23  many cases, the people they trusted more than anyone in the

24  world took advantage of them.  And without a doubt,

25  Mr. Schrank added to that -- all of those acts by viewing

UNREDACTED TRANSCRIPT

1  this material.

2          The Sixth Circuit wants me to recognize what he

3  had to do to do that.  I will recognize it, that he did go to

4  the dark web.  He went to a place on the computer that's not

5  easily accessible and found this material in a way that was

6  not traceable.  He also, as is pointed out in the presentence

7  report, had to make a comment on the material.  And I think

8  we all acknowledge it was -- in order to stay on the site,

9  you had to make a comment on the material.  And he did that.

10 I think the proof is that this was done over three-day's

11 time.

12          Is that right, Ms. Ireland?

13          MS. IRELAND:  The access that was counted while

14 the Government had access to it was over three-day's time;

15 however, the time that the site was up was much longer, and

16 we were not able to collect those things during the time

17 period that it was not under the Government's control.  So it

18 is an indeterminate amount of time, but during that 10- to

19 14-day time period, that -- what you site is correct.

20          THE COURT:  Okay.  Again, what Mr. -- the

21 decision Mr. Schrank made during this time period, the

22 decisions, were horrible because they contributed to the

23 market.  They took advantage of what had occurred in these

24 children's lives that is obviously reprehensible.

25          The next factor, history and characteristics of

1    the defendant.  We talked about this, obviously, at the

2    original sentencing hearing.  Two minor drug offenses.  More

3    indicative of some of the things he was going through at the

4    time.  And I don't -- Mr. Mesler referred to a little bit to

5    that -- to that history.  I don't want to -- I don't think I

6    have to go through everything again, but the records reflect

7    many of the things Mr. Schrank was going through first as a

8    teenager.  Some of those things, you know, were sort of -- I

9    guess I'd kind of characterize them as some typical teenage

10   struggles, but a little bit on steroids.  A little bit worse

11   than your typical teenage troubles.  But then the -- then the

12   death of the mother hits.  And, you know -- were you 17 when

13   your mother died?

14              THE DEFENDANT:  I believe so.  Yes, ma'am.

15              THE COURT:  Okay.  You know, a 17 year old, who's

16   had some teenage struggles, but then, you know, mother has a

17   massive heart attack in front of him.  And clearly the

18   reaction to all of that.  And Mr. Schrank's father spoke

19   before and has outlined in the letter the difficulties that

20   everyone in the family went through as a result of that.  You

21   know, hindsight is always 20/20.  And it's clear that Mr. --

22   Defendant Mr. Schrank, Mr. Dane Schrank, you know, needed

23   help at the time as a 17 year old who had just witnessed his

24   mother's death.  Didn't get the help.  Went on and, you know,

25   the accident that -- car accident that altered everything.

1 The burglaries.

2          So we have a roughly 19 year old who has lost his

3 mother.  I think there's a loss of the grandfather too.  But

4 I don't want to -- not to underestimate that, but you were

5 sort of a natural age for the potential to lose a

6 grandfather.  But really the loss of a mother, the loss of

7 his sort of freedom because of the accident and the burglary,

8 loss of everything he owned, combined with the normal things

9 we all go through in life resulted in unfortunately a perfect

10 storm of things that I think led Mr. Schrank to make these

11 decisions that he did at the time.

12          The other part of the history and

13 characteristics, I have to again mention all the letters.

14 The letters from before describe a man who was very different

15 than the man two years prior to that who made these

16 decisions.  The letters today, another two years since,

17 describe even more so a very different man than the one who

18 engaged in these actions now roughly four years ago.  The

19 letters from -- well, first he's completed the home

20 confinement time.  He's current with sex offender treatment,

21 and according to the letter has a very high level of

22 participation in the program.  He's current with the registry

23 issues.

24          And then the -- I've got three letters from

25 people, from his employer.  I've got a letter from a friend.

1    I've got the combined letter from the Men of Fight Club.

2    I've got the letter from the pastor.  I've got another letter

3    from a friend.  I got the letter from his sister.  And then

4    the letter from his father, with sort of the list of the

5    things that Mr. Schrank has done since the last sentencing.

6    All of these letters -- I think Mr. Mesler actually said it

7    well and a lot simpler and quicker than I just did.  All of

8    these letters indicate that what Mr. Schrank has done in the

9    last two years has -- I don't want to put it in the terms of

10   proved me right.  I'd say more proved Mr. Schrank right, that

11   when he was here two years ago and we talked about the

12   letters and the things he had done in his life and the things

13   not just to make himself better, to work on his own mental

14   health and physical health, but to help others as well.

15   That's just increased.  I'm particularly struck by -- there's

16   a letter from Mr. Yoon, I guess, that talks about -- who is

17   your supervisor, as I understand it; right?

18              THE DEFENDANT:  Correct.

19              THE COURT:  Mr. Yoon I'm assuming is not here

20   today?

21              THE DEFENDANT:  He's not.

22              THE COURT:  There's a letter.  So there's a

23   letter from Mr. Yoon who says, you know, he relies on you.

24   You're a great employee.  And you've helped him in his own

25   personal fitness regimen.  Then there's the letter from

UNREDACTED TRANSCRIPT

1   Mr. Schrank's father, who talks about Mr. Yoon and talks

2   about how Mr. Yoon was going through some significant

3   personal struggles himself, including some pretty significant

4   mental health struggles.  And what your dad says is you

5   helped him.  And perhaps you weren't the only one in his life

6   that helped him, but you were one of the people in Mr. Yune's

7   life who helped him with issues like thoughts of suicide,

8   struggles with substance abuse because of the things that

9   were going on in Mr. Yune's life.

10           That's the sort of thing when you're -- that

11   honestly impresses me as you perhaps always were, and now are

12   allowing more of this to come out, the kind of guy who's

13   going to try to look out for those around you and help those

14   around you.

15           Tell me about the Vanderbilt classes.

16           THE DEFENDANT:  So I'm taking classes online from

17   Vanderbilt for web design, a little bit of computer science

18   and just various other coding languages.  And October 14th is

19   the last scheduled day.  I believe I actually go up there at

20   some point somewhere -- I've still got to get details on

21   that -- but present all the projects that I've done.  I have

22   a resume, per se, a portfolio online of all the things that

23   I've done, some stuff about me.  I'm not entirely sure who's

24   going to be there as far as like employers and possible job

25   opportunities, but October 14th is the last day that I'll be

1  taking those classes and should be getting a certificate of

2  completion for those categories.

3              THE COURT:  So it's a certificate program?

4              THE DEFENDANT:  Right.  I'm not taking any

5  Gen Eds right now.  It's kind of like a, I guess, fast-track

6  you'd say.

7              THE COURT:  Yeah.

8              THE DEFENDANT:  Just because, I mean, it's not

9  really needed for computer science.  I mean, math would help

10 a little bit, but it's all stuff that you can pretty much

11 learn on your own.

12             THE COURT:  And how long has that been overall?

13             THE DEFENDANT:  I believe it started in April,

14 mid to late April.

15             THE COURT:  Okay.  And you're going to leave

16 Hawaiian Pools?

17             THE DEFENDANT:  So I might be leaving, but

18 there's also a good chance that I'm not.  I haven't had a

19 meeting with the owner yet.  But he wants me to potentially

20 take over the website.  He's also planning on expanding to

21 Knoxville, Nashville and some other places and also getting a

22 sister company.  So there's definite possibilities for growth

23 in the company.  I just have to make sure that it's meeting

24 what I prefer to have happen.

25             THE COURT:  So in terms of the 3553, in terms of

1  history and characteristics, I have a man in front of me who

2  without a doubt had a point in his life where he dealt with

3  some significant struggles, made this horrible decision at

4  that point where he was dealing with significant struggles,

5  and since that time has sort of -- I don't want to say done

6  everything right, although that's applicable, but really done

7  everything positive to address those issues and to, as far as

8  I can see, understand what led him to those decisions and put

9  himself in a position where he would not be led to those

10  decisions again.

11         That leads us then to adequate deterrence to

12  criminal conduct, protecting the public from further crime,

13  promoting respect for the law and providing a just

14  punishment.  In terms of specific deterrence, protecting the

15  public from further crime from Mr. Schrank, promoting respect

16  for the law of Mr. Schrank, I'm not sure Ms. Ireland that you

17  have a disagreement that those are not issues that we are

18  worried about at this point with regard to Mr. Schrank

19  himself.

20         Would that be a fair statement?

21         MS. IRELAND:  That's a very fair statement, Your

22  Honor.  Our objection was very specific.  And we are happy to

23  acknowledge his success, and that he has done well, and that

24  he has done not just the things required, but good things.

25  We do not have an issue with that, Your Honor.

UNREDACTED TRANSCRIPT

1          THE COURT:  And that's the way I took your

2     position today.  And frankly, I think that's -- you were

3     relatively happy with that at the first hearing.

4          MS. IRELAND:  Yes.  Yes.

5          THE COURT:  Okay.  What remains, though, in those

6     factors is the issue of general deterrence, as well as the

7     issue of a just punishment.  Let me try and tackle general

8     deterrence.  As I said, and as I've said in sentencings

9     before, you know, all of these factors a judge is required to

10    take into consideration and weigh and evaluate and include to

11    the extent the judge finds applicable in a particular

12    situation.  And, I've said this before, I am often -- I often

13    don't think that general deterrence becomes something as

14    important in some situations, as opposed to other situations.

15         I'll say that in the -- with regard to these

16    types of cases, I do think general deterrence should be a

17    factor and can be a factor and can affect other people mainly

18    because in a lot of these situations, we're dealing with sort

19    of more sophisticated people who will hear about other

20    sentences.  And, Mr. Schrank, I don't say that to disagree

21    with your statement that for you personally you never looked

22    at what, you know, this might result in.  And I'm sure there

23    are lots of people who don't.  But for some, it without a

24    doubt is a possibility.  And I think I've said that in other

25    sentences dealing with these types of issues.

1          The question, though, really is for me sort of

2     what Mr. Mesler raised.  So in balancing, what does general

3     deterrence tell me about a sentence I should impose in the

4     landscape of all of these factors and in the landscape of

5     every sentence is supposed to be individualized to a specific

6     person.  It seems to me there is a real conflict there.  I

7     can't sentence Mr. Schrank to a sentence different than what

8     I think he should otherwise get because there's someone out

9     there who sees that sentence and would not engage in that

10    behavior because Mr. Schrank got a particular sentence.  I

11    have to figure out some way to meld these factors together

12    and to weigh them all together and arrive at what I think is

13    an appropriate sentence in Mr. Schrank's case.

14          And that's really difficult in this situation.

15    And it does raise the position that Mr. Mesler is essentially

16    making, which is -- so even if Mr. Schrank's sentence is an

17    outlier from those that I've imposed -- those that I and

18    others have imposed in other situations, whoever -- and I

19    don't remember who the 50-month sentence was who -- that I

20    sentenced the -- the week after?

21          MS. IRELAND:  Yes, Your Honor.

22          THE COURT:  Who was it?

23          MS. IRELAND:  Benjamin Edwards.  I have a case

24    number if you'd like.

25          THE COURT:  I don't -- I hate admitting this on

UNREDACTED TRANSCRIPT

1    the bench, but I don't remember.  If I saw the -- if I read

2    the information about Mr. Edwards, I would no doubt remember

3    him, but I can't -- I don't remember him off the top of my

4    head.

5              So the issue is, you know, is Mr. Schrank -- do I

6    impose a particular sentence for Mr. Schrank to send this

7    message of general deterrence even if I think everything else

8    about Mr. Schrank argues for something different, or do I

9    allow Mr. Schrank to be an outlier and rely on Mr. Edwards

10   and other sentences that I've given in situations like this

11   to send a message of general deterrence.

12             I can't -- and maybe the Sixth Circuit will

13   reverse me again, but I can't impose a sentence on

14   Mr. Schrank that otherwise does not make sense to me just to

15   send a -- let me not say just, because it is an important

16   message to be sent.  But I can't impose a sentence on him

17   that doesn't make sense to me because of general deterrence.

18   I have to at the end of the day still be able to justify to

19   myself the appropriateness of the sentence that I arrive at

20   for Mr. Schrank.  I don't think that that's ignoring general

21   deterrence.  I think what it's saying is that I have to weigh

22   general deterrence against all the other factors that are to

23   be considered as part of the 3553 factors and arrive at

24   something that is sufficient, but not greater than necessary

25   to accomplish the purposes of Mr. Schrank's sentencing.

1          There is the issue of just punishment as well in

2     those factors that I listed.  Mr. Schrank is -- has a felony

3     conviction, has a very significant felony conviction on his

4     record.  He has so far served a period of 12 months of home

5     detention.  Required to do a number of other things, register

6     on the sex offender registry and so forth.  He -- I think the

7     issue of just punishment has been addressed, again very

8     specific to Mr. Schrank's individual situation.

9          In terms of educational/vocational training, I

10    think there -- I think we're all fine with the conditions of

11    supervised release and the things that Mr. Schrank is to

12    have -- is engaging in as part of supervised release.

13         So in deciding what sentence to impose, I

14    consider the 3553 factors and the advisory sentencing

15    guidelines.  I'm going to state it this way:  In considering

16    the severity of the offense and general deterrence, two

17    factors that are obviously important in this case and are --

18    not just because the Sixth Circuit told me to, but are, you

19    know, important to always consider, I have to weigh -- I'm

20    weighing the importance of those two things against not only

21    what Mr. Schrank did before his original sentencing, but even

22    more so what Mr. Schrank has continued to do in his life in

23    the time since his previous sentencing.

24         He has continued to abide by the law.  He has --

25    there have not been any substance abuse issues.  There have

1    not been any issues at all, any negative issues.  He's

2    complied, as far as I can see to a tee, to all of the

3    conditions that I imposed on him.  The information from all

4    sources that I've been given have shown that he has not only

5    continued to do what he was doing in the two years before the

6    first sentencing, but he has even sort of stepped it up,

7    improved in his employment, continued to progress in his

8    employment and continued to see the counselor, get

9    counselling, attend all sex offender treatment programs,

10   participate positively in sex offender treatment programs,

11   gotten more education through Vanderbilt.  He has done not

12   just everything we've asked him to do, but he's done

13   everything that we would want him to do on his own.

14           And particularly relying on what he's done in the

15   last two years, I again don't see any value in sending

16   Mr. Schrank to prison.  So I am going to stick by my original

17   sentence.  And I guess we have to do a new judgment, but I

18   don't see any reason -- even in considering the additional

19   factors the Sixth Circuit wanted me to consider, I don't see

20   any reason to change that original sentence.

21           And I hope that if this is appealed again and the

22   Sixth Circuit is considering it again, that that

23   consideration will take into account that this is a decision

24   that's been based on a weighing of all of the factors

25   involved in 3553, that it's based on the material that I've

UNREDACTED TRANSCRIPT

1   been submitted and required to evaluate and weigh, that it's

2   been based on what I have -- the new material that's been

3   submitted as to what Mr. Schrank has done since the last

4   sentencing.  And I don't think there's a factor -- I don't

5   think there's a factor I've failed to weigh.

6          Anything else you would like me to consider,

7   Ms. Ireland?

8          MS. IRELAND:  Once Your Honor imposes sentence,

9   the United States will register its objections.

10         THE COURT:  Okay.

11         MS. IRELAND:  Unless you wish to have them now.

12         THE COURT:  Well, I'd like to hear anything that

13   you feel like I've failed to address.

14         MS. IRELAND:  Your Honor, it would be our

15   position that the sentence to be imposed contributes to

16   unwarranted disparities in sentencing in similarly situated

17   defendants in cases.  And that while Your Honor has

18   acknowledged the seriousness of the offense and continues to

19   do so, the sentence itself does not reflect that.  And so we

20   would object.

21         THE COURT:  Well, in terms of sentencing

22   disparities, I do -- you know, the sentencing guidelines are

23   certainly designed to try and reduce sentencing disparities

24   as much as possible, but I always think that that has to be

25   weighed against the individual who is in front of me and the

1  factors related to that individual, him or herself.  And

2  while I do acknowledge this -- this is a disparity, and it

3  would be a disparity in similar cases, as you pointed out the

4  person that I sentenced to 50 months, but I would say that in

5  terms of sentencing disparities -- I guess I didn't give you

6  a chance to speak, Mr. Mesler, but I'm going to use your

7  words anyway -- there's always going to be an outlier.  And I

8  would -- you know, I feel like what I've done is I've gone

9  carefully through the material.  I've evaluated the extreme

10 seriousness of the crime, the extremeness of the behavior

11 that Mr. Schrank did engage in, but along with what has

12 occurred since then and the other fac- -- I'm going to try

13 not to repeat myself again.  But I've weighed that against

14 all of the other factors that are the appropriate factors

15 that come to bear and ended up in a position in my head after

16 weighing all those factors at a decision that I feel like Mr.

17 Schrank is just going to be the outlier.

18           MS. IRELAND:  Understand, Your Honor.  We object

19 to the substantive unreasonableness of the sentence.

20           THE COURT:  Okay.  All right.  Any other

21 objections before I impose the sentence?

22           MR. MESLER:  None from the defense, Your Honor.

23           THE COURT:  Pursuant to the Sentencing Reform Act

24 of 1984, it's the judgment of the Court that the Defendant,

25 Dane Schrank, is hereby committed to the custody of the

1   Bureau of Prisons to be imprisoned for a term of time served.

2   Upon release from imprisonment, the Defendant shall be placed

3   on supervised release for a term of five years.  Within

4   72 hours of release from custody of the Bureau of Prisons,

5   the Defendant shall report in person to the probation office

6   in the district in which the Defendant is released.

7           Defendant shall abide by the following conditions

8   of supervised release:  The defendant shall cooperate in the

9   collection of DNA.  The defendant shall participate in drug

10  testing and treatment as directed by the probation officer.

11  The defendant's employment and change of address must be

12  approved by the probation officer.  The defendant may not

13  directly or indirectly have contact with any child under age

14  18, excludeing biological children, and may not loiter near

15  schoolyards, playgrounds, swimming pools, arcades or other

16  places frequented by children.

17          The defendant is allowed to have supervised

18  contact with his biological children and is not precluded

19  from being in public accommodations, restaurants, grocery

20  stores, et cetera, where children are only incidentally

21  present.  The defendant's place of residence may not be close

22  in proximity to parks, playgrounds, public pools or other

23  locations frequented by children.  The defendant must abide

24  by an evening curfew as set by the probation officer, which

25  may include submitting to remote monitoring, including

1    wearing and maintaining a device for such purposes, which may

2    not be removed without the probation officer's permission.

3    The defendant shall not possess or use any -- an electronic

4    device or computer with access to any online computer service

5    or other forms of wireless communication at any location,

6    including employment, without the prior approval of the

7    probation officer.  This includes any Internet service

8    provider, bulletin board system or any other public or

9    private network or e-mail system.

10            The defendant shall complete and comply with sex

11   offender registry requirements, sex offender treatment

12   conditions, polygraph examination conditions, and shall

13   follow the specific instructions of the probation officer in

14   regard to these requirements.  The defendant may not possess

15   any sexually explicit material, pornography and may not use

16   sexually-oriented telephone numbers or computer services.

17            Pursuant to 18 U.S.C. 3563(b)(23), the defendant

18   shall submit his person and any property, house, residence,

19   vehicle, papers, computers or other electronic communication

20   or data storage device or media -- devices or media and

21   effects to search at any time, with or without a warrant, by

22   law enforcement or probation officer with reasonable

23   suspicion concerning a violation of the condition of

24   probation or unlawful conduct by the person and by any

25   probation officer in the lawful discharge of the officer's

1   supervision functions.

2            The defendant shall participate in mental health

3   assessment and treatment as directed by the probation

4   officer.  The defendant shall not commit another federal,

5   state or local crime.  The defendant shall not possess

6   illegal controlled substances.  And the defendant shall not

7   be in possession of firearms.  All other standard conditions

8   shall apply.  There will be no fine.  No victim information

9   was received to support restitution.

10           MS. IRELAND:  That's correct.

11           THE COURT:  It's further ordered that the

12  Defendant shall pay to the United States a special assessment

13  of $100, which shall be due immediately, and then the special

14  assessment of $5,000, which shall be due immediately.  I

15  didn't have it here, but I also -- yeah, here.  The Defendant

16  shall also serve 12 months of home confinement -- of home

17  detention, with voice recognition as the monitoring system.

18  That's already been served, but that was another condition of

19  the supervised release.

20           Mr. Schrank, you have a right to appeal the

21  sentence, but you waived your right, unless I sentence you to

22  something more than the guidelines, or if there's been

23  prosecutorial misconduct or ineffective assistance of

24  counsel.  Waiver is usually enforced by the Court of Appeals,

25  but if you think something was improper, you can argue that

35

```
1    to the Court of Appeals.  If you wish to appeal, the notice

2    has to be filed within 14 days of when they enter the

3    judgment, or 14 days if the Government were to appeal.  If

4    you wish the clerk to prepare and file your notice of appeal,

5    you can make that request.  If you wish to appeal and can't

6    afford the cost of an appeal or the cost of a lawyer, you can

7    seek to appeal in forma pauperis without paying and seek the

8    appointment of counsel.  That packet has your appeal rights

9    in it.

10                Mistakes or problems with the sentence?

11                MR. MESLER:  None, Your Honor.

12                MS. IRELAND:  Only as otherwise noted, Your

13   Honor.

14                THE COURT:  Well, that's not a mistake or

15   problem.

16                MS. IRELAND:  No, not a mistake or problem.

17                THE COURT:  Yours is an objection.

18                MS. IRELAND:  Well, different kind of problem, I

19   guess, interpretively.  So, yes, it is an objection, Your

20   Honor.  Nothing out of the ordinary or --

21                THE COURT:  No pro- --

22                MS. IRELAND:  -- no error in the procedure or the

23   sentence imposed.

24                THE COURT:  Got it.  All right.  Anything else we

25   need to address today?
```

1          MR. MESLER:  I have a question just to show my
2    ignorance on this because I haven't had a re-sentencing
3    before either.  I know that the home detention the Court said
4    he's already served that, and he's paid the $5,000
5    assessment, things of that nature, but the five-year
6    supervised release, just so that I can advise my client, does
7    that start today or is it retroactive to when he was doing it
8    before?
9          THE COURT:  It should be retroactive.  I mean,
10   everything should be what it --
11         MR. MESLER:  I just --
12         MS. IRELAND:  Perhaps if Your Honor would say
13   credit for the year already served, then we're covered on
14   supervised release?
15         THE COURT:  Yeah.  Well, that's true.
16         MS. IRELAND:  Because I don't know the answer to
17   that question.
18         MR. MESLER:  It hasn't come up for me.
19         THE COURT:  Yeah.  And there may be language,
20   actually, that I put in the amended judgment or judgment or
21   re-sentencing, whatever we call it, that says all of it is
22   retroactive to the original date, because that would cover
23   the 12 months home detention as well.  So I'll look at how we
24   phrase that in the judgment.
25         MR. MESLER:  Thank you.

                      UNREDACTED TRANSCRIPT

1          THE COURT:  All right.  Anything else?

2          MR. MESLER:  No, Your Honor.

3          MS. IRELAND:  No, Your Honor.

4          THE COURT:  Mr. Schrank, do you have any

5   questions about anything?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  You know not to listen to the legal

8   advice of your parole officer or your therapist?

9          THE DEFENDANT:  Absolutely.

10          THE COURT:  We may be back.  We will see.

11          THE DEFENDANT:  May be.

12          THE COURT:  All right.  Good luck to you,

13   Mr. Schrank.

14          MR. MESLER:  Thank you, Your Honor.

15          MS. IRELAND:  May we be excused?

16          THE COURT:  Yes.

17          (Adjournment.)

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

38

1              **C E R T I F I C A T E**

2

3

4         I, CANDACE S. COVEY, do hereby certify that the

5    foregoing 38 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the Re-Sentencing hearing on the 7th day

8    of August, 2019, in the matter of:

9

10

11   United States of America

12   vs.

13   Dane Schrank

14

15   Dated this 9th day of August, 2019.

16

17

18

19                         _____S/Candace S. Covey_____

20                         CANDACE S. COVEY, LCR, RDR, CRR
                           Official Court Reporter
21                         United States District Court
                           Western District of Tennessee
22

23

24

25

                    UNREDACTED TRANSCRIPT